UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

LOJY AIR COMPANY, an Egyptian
Corporation,

    Plaintiff,

  v.

GLOBAL FINANCIAL & LEASING, INC.,
an Oregon corporation, and RICHARD KEITH
WARD,

    Defendants.

Case No. 3:17-CV-00920-YY

RECOMMENDED FINDINGS
OF FACT AND
CONCLUSIONS OF LAW

YOU, Magistrate Judge.

  In this diversity suit, plaintiff Lojy Air Company ("Lojy Air") alleges claims of fraud in

the inducement, fraud, negligent misrepresentation, breach of contract, and breach of the implied

duty of good faith and fair dealing, against defendants Global Financial & Leasing, Inc. ("Global

Financial") and Richard Keith Ward ("Ward").[1] Compl., ECF 1. Defendants have filed a

Motion to Enforce Settlement, seeking "an order finding that the parties have entered into an

enforceable settlement agreement resolving their disputes." Mot. 1-2, ECF 26. Based on the

---

[1] This court has diversity jurisdiction over the present action pursuant to 28 U.S.C. § 1332(a)(1),
because Lojy Air is a citizen of Egypt, both defendants are citizens of Oregon, and the amount in
controversy exceeds $75,000. Compl. ¶¶ 1-5, ECF 1.

record in this case and the evidence adduced at the evidentiary hearing held on September 13,

2021, and December 14, 2021, the undersigned makes the following recommended findings of

fact and conclusions of law, and recommends that defendants' motion (ECF 26) should be

GRANTED.

## RECOMMENDED FINDINGS OF FACT

1.      Lojy Air is an Egyptian aviation company led by Galal Barakat ("Barakat"), who

is a pilot and serves as the C.E.O.  Compl. ¶ 1, ECF 1.

2.      Global Financial is an Oregon-based aviation finance company.  *Id.* ¶ 2.  The

company is led by Ward who is president and C.E.O.  *Id.* ¶ 3.

3.      On September 3, 2010, Global Financial filed suit against Lojy Air in Multnomah

County Circuit Court.  *Global Financial & Leasing, Inc. v. Lojy Air Company*, No. 100912984

(Multnomah County Circuit Court, 2010).   Lojy removed the case to this court on November 5,

2010, citing diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  Not. Removal ¶ 10, ECF

1, No. 3:10-cv-1369-PK ("*Lojy I*").  Lojy subsequently filed counterclaims and a third-party

complaint naming Ward as a third-party defendant.  First Am. Answer, ECF 24, *Lojy I*.

4.      On June 10, 2014, the parties informed the court that the case had settled, and the

court issued an order dismissing *Lojy I* with prejudice "with leave, upon good cause shown

within sixty (60) days, to have this order of dismissal set aside and the action reinstated if the

settlement is not consummated."[2]  Order, ECF 79, *Lojy I.*

---

[2] Under L.R. 41-1(c), "[u]pon notice of settlement pursuant to LR 41-1(a), the Court may direct
the clerk to dismiss the case with prejudice (unless otherwise specified) and without costs, and
with rights to any party to reopen the case in the event of a failure to consummate the final
settlement agreement within 60 days."

5.      On June 13, 2017, Lojy Air commenced the present action in this court, alleging five claims against defendants Ward and Global Financial, Compl. ¶¶ 11-30, ECF 1, and seeking $750,000 in relief.  *Id.* ¶ 30(a)-(f).

6.      On August 14, 2018, Charles Bolen, defendants' counsel, wrote to Phillip Griffin, then-plaintiff's counsel, and expressed that defendants were "in a tenuous financial situation" that included $300,000 in tax liens and the possibility of bankruptcy, and "any judgment against them [would] be unenforceable."  Def. Ex. 101-1, ECF 47.  Bolen explained that defendants were willing to offer $10,000, "payable within 15 days of execution of a settlement agreement and release of Defendants."  Def. Ex. 101-2, ECF 47.  Because the settlement offer was "intended to spare the parties from incurring further time and expense," Bolen expressly stated that the offer was open and valid for only seven days.  *Id.*

7.      At the evidentiary hearing, Griffin testified that upon receiving Bolen's letter, he told Bolen that he needed more time to conduct an independent investigation to verify defendants' alleged financial problems.  Griffin also testified that Bolen agreed to keep the settlement offer open to allow him to hire an investigator and evaluate defendants' finances. Griffin testified that the investigation confirmed defendants' financial problems, and Griffin communicated the results of the investigation to Barakat.

8.      At the time, Griffin, who is now retired, had been practicing law for nearly 35 years, and was a member of the bar in good standing.  He testified that he had represented Barakat for approximately 10 years.  Griffin also testified that he communicated with Barakat in English and never had any doubts about Barakat's capacity to understand their communications or his ability to convey his desires to Griffin.  Griffin and Barakat largely communicated through a social app called WeChat, but occasionally spoke by phone.

9.      On January 2, 2019, Griffin texted Barakat, "I will be filing a withdrawal of counsel this week.  Let me know if you have changed your mind on the settlement."  Pl. Ex. 2-1, ECF 53.  Barakat testified that Griffin tried to coerce or persuade him into accepting the settlement offer by threatening to withdraw on multiple occasions.  Barakat wrote back, "Phil, please help me, [I] don't want the $10,000.  I want and gudagment [sic] against him.  Please continue in the case.  Thanks."[3]  *Id.*[4]

10.     A week later, on January 9, 2019, Barakat emailed Griffin, "[I]n case of I accept the settlement, is that better to be before or after the deposition, please advis[e]."  Def. Ex. 102-1, ECF 47.  Griffin responded, "Before."  *Id.*  Barakat then informed Griffin:

> I will go for the settlement, but please you most <u>PHYSICALLY EXCHANGE THE SETTLEMENT DOCUMENTS FOR A $10,000 CASH, OR A CERTIFIED CASHIERS CHECK</u>. ALSO YOU NEED TO  DETERMINE WHICH IT WILL BE BEFOREHAND, AND <u>IF IT IS A CASHIERS CHECK, WE NEED DO THE EXCHANGE IN THAT CASHIER'S CHECK "BANK OFFICE", SO YOU CAN "CASH THE CHECK" RIGHT THERE AND THEN WITH YOUR POWER OF ATIORNEY</u> ... Otherwise, Ward will just DEFAULT ON THIS SETTLEMENT TOO .... and WE will never get paid. Please advise your thoughts.

*Id.* (all-capitals and underlined emphasis in original).  Barakat's email contains no mention of a monetary amount other than $10,000, and Griffin testified that Barakat's authority to accept the offer was not conditioned on Barakat receiving an additional $250,000.

11.     Griffin concurred with Barakat's payment plan, and reassured him that he would "try to get the settlement money as soon as possible."  Def. Ex. 104-1, ECF 47.  Barakat replied, "Thanks Phillip, my heart is bleeding, I've a broken heart, I feel I'm not a man."  *Id.*  At the

---

[3] Presumably, by "gudagment," Barakat meant judgment.

[4] Communications between an attorney and their client are generally protected under the attorney-client privilege.  There is no issue here because plaintiff waived the privilege.  *See* ECF 35.

evidentiary hearing, Barakat testified, "I told him I was feeling that my heart is broken because I responded to his pressure."

12.     The same morning, Griffin informed Bolen and Melissa Button, defendants' counsel, that plaintiff would "accept Mr. Ward's offer of $10,000 for settlement."  Def. Ex. 103, ECF 47.  He asked Bolen and Button to "confirm that we have a settlement."  *Id.*

13.     Later that day, Button replied: "Mr. Ward agrees to settle for $10,000."  Def. Ex. 105-1, ECF 47.  She added that defendants' attorneys would "prepare a settlement and release agreement and send it to you for your review."  *Id.*

14.     The next day, January 10, 2019, Button emailed Griffin with an attached settlement agreement and asked whether it was "acceptable to you and your client."  Def. Ex. 107-1, ECF 47.  The attached settlement agreement consisted of seven sections: (1) "Payment," (2) "Dismissal of Civil Action," (3) "Mutual General Releases," (4) "No Admission of Liability," (5) "Confidentiality and Non-Disparagement," (6) "Miscellaneous," and (7) "Mutual Acknowledgements."  *Id.* at 107-4-6.

15.     Griffin forwarded Button's email and attached settlement agreement to Barakat and asked him to read it, adding "It looks like we will be able to wrap this up shortly."  Def. Ex. 108-1, ECF 47.  Barakat replied the same day, stating, "I need to review this agreement and comment," which he said he would do as soon as he returned to Egypt in a week.  *Id.*

16.     Two weeks later, on January 24, 2019, Barakat informed Griffin: "According to The exchanged emails between you and I you should be still waiting for my review of the settlement agreement, which will not be active unless I approved, so I conceder [sic] the case is no[t] settled until I approve the agreement and signed."  Def. Ex. 111, ECF 47.  He requested

that Griffin "immediately stop every action to settle the case until I [sic] back home and advise you to proceed." *Id.*

17.    Griffin replied, "The case settled when your verbal acceptance was given to defendants. If you choose not to sign the settlement agreement it is of little consequence. Defendants can sue to enforce the verbal settlement agreement." Def. Ex. 112, ECF 47.

18.    In response, Barakat wrote:

Philip

I do want you and I have a pleasant end, I understand you don't want the case any more, I don't understand why, your firm was paid until the last invoice which I still waiting for you letter to transfer the money, but if you even don't want the case *you need to give me sometime to get back home, review with somebody the agreement, make up my mind and advise you, I don't care about the $10,000* in the first place. But I need to see what should I do, *I called my friends in USA they all confirming the case is not settle yet.*

Why when ward settled before and he breached the settlement that was ok and *now when I say stop before we signed any papers is not ok.*

Please Philip give me some time, also please advise have you filled a withdrawal from the case or not yet, if yes please what was the date of filling.

Thanks Philip
Galal

Def. Ex. 113, ECF 47 (emphasis added).

19.    On February 7, 2019, Barakat emailed Griffin and stated that the "terms and condition [sic] are not acceptable." Def. Ex. 115, ECF 47. Barakat instructed Griffin to inform defendants' counsel that "in order to I settle for [defendants'] terms and condition I'll settle for hundred and fifty thousand dollars." *Id.* He further wrote, "Please inform ward lawyer for their agreement I settle for $150,000. For $10,000 I issue the agreement." *Id.* Griffin responded by asking Barakat to identify what terms in Button's proposal were unacceptable to him. Def. Ex. 116, ECF 47.

20.    The next week, on February 14, 2019, Barakat emailed Griffin the text of the

agreement he was willing to sign, "no more[,] no less."  Def. Ex. 117, ECF 47.  Griffin

forwarded the text of Barakat's proposal to Bolen the following morning.  Def. Ex. 118, ECF 47.

21.    A comparison of Barakat's proposed agreement with Button's original proposal

shows that Barakat's proposal consists of the original agreement with only sections (1)

"Payment" and (2) "Dismissal of Civil Action" included.  Otherwise stated, sections (3) "Mutual

General Releases," (4) "No Admission of Liability," (5) "Confidentiality and Non-

Disparagement," (6) "Miscellaneous," and (7) "Mutual Acknowledgements" were not included

in Barakat proposal.  *See* Def. Ex. 107-4-6*,* ECF 47; Def. Ex. 117, ECF 47.

22.    On February 19, 2019, Button emailed Griffin a revised settlement agreement and

asked whether it was acceptable to plaintiff.  Def. Ex. 121-1, ECF 47.  A comparison of Button's

revised agreement with Barakat's proposals shows that both are nearly identical, save for the

inclusion of section (3) "Mutual General Releases" in Button's revised proposal.  *See* Def. Ex.

117, ECF 47; Def. Ex. 121-3-4, ECF 47.

23.    The same evening, Barakat emailed to Griffin the text of a proposed "counter

settlement."  Def. Ex. 122, ECF 47.  Barakat's "counter settlement" was exactly the same as his

original proposed agreement; it did not contain section (3) "Mutual General Releases."  *Id.*; Def.

Ex. 117, ECF 47.

24.    Two days later, on February 21, 2019, Griffin emailed Barakat a formatted

settlement agreement and explained that he included the mutuality clause to "protect [plaintiff]

from [defendants'] claims."  Def. Ex. 123, ECF 47.  Barakat replied the same day insisting the

mutuality clause be removed.  *Id.*

25.     The next day, on February 22, 2019, Griffin informed Barakat that he was no longer willing to work with him.  Def. Ex. 124-1, ECF 47.  Griffin explained that Barakat's conduct was, in his opinion, "erratic and unreasonable," and specifically noted that "removing [the mutuality clause] in the settlement agreement is absurd."  *Id.*

26.     On March 12, 2019, Griffin notified Button of Barakat's continued refusal to sign the settlement agreement with the mutuality clause.  Def. Ex. 125-1, ECF 47.  In response, Button stated that defendants were "willing to sign the settlement" that Barakat proposed, and attached a formatted settlement agreement that was identical to Barakat's final proposal.  Def. Ex. 126-1-3, ECF 47.

27.     On April 2, 2019, Griffin informed the court of his intention to withdraw as plaintiff's counsel.  Mot. Withdraw, ECF 22.  In his declaration, Griffin wrote: "My client, the Plaintiff, has engaged in conduct, that I feel continued representation of him will result in a violation of the Rules of Professional Conduct.  Additionally, the client insists upon taking action that I consider both repugnant and with which I have a fundamental disagreement."  Griffin Decl. ¶ 2, ECF 22-1.  The court granted Griffin's motion on April 4, 2019.  ECF 23.

28.     On June 17, 2019, defendants filed this Motion to Enforce Settlement.  ECF 26.  Attached to defendants' motion is a copy of the formatted settlement agreement that Button sent on March 12, 2019.  *Id.* at 4, ECF 26; Def. Ex. 126-1-3, ECF 47.  Thus, the proposed settlement that defendants are asking this court to enforce contains only two sections: (1) "Payment" and (2) "Dismissal of Civil Action."  *Id.*

29.     On July 15, 2019, plaintiff filed a Memorandum in Opposition to the Motion to Enforce Settlement.  ECF 31.  Plaintiff also submitted a declaration from Barakat stating that the parties "did not come to any agreement as to the term or amount of the installment payments."

Barakat Decl. ¶ 5, ECF 31-1.  Barakat declared that he and Griffin had discussed the possibility

of a settlement with defendants, but that the terms of the deal would require "defendants making

an immediate payment of $10,000, plus an additional $250,000" in installment payments.  *Id.* ¶

4.  Finally, Barakat declared that he "never told Mr. Griffin [he] would settle [this] case for only

$10,000." *Id.* ¶ 6.

## RECOMMENDED CONCLUSIONS OF LAW

### I.    Authority to Enforce Settlement

"It is well settled that a district court has the equitable power to enforce summarily an

agreement to settle a case pending before it."  *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987).[5]

"An action for specific performance without a claim for damages is purely equitable and

historically has always been tried to the court."  *Adams v. Johns-Manville Corp.*, 876 F.2d 702,

709-10 (9th Cir. 1989) (citing *Owens–Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1189

(3d. Cir. 1979)); *see also Callie*, 829 F.2d at 891 (directing the district court, and not a jury, to

resolve a factual dispute over whether there was a "meeting of the minds sufficient to effect a

settlement agreement").[6]  Although a motion to enforce a settlement agreement may be decided

_____

[5] This conclusion of law is consistent with the Supreme Court's opinion in *Kokkonen v.
Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994).  In *Kokkonen*, the Supreme Court held that
district courts do not inherently possess ancillary jurisdiction to enforce the terms of a settlement
agreement.  *Id.*  However, *Kokkonen* is distinguishable through its procedural posture: the district
court in *Kokkonen* dismissed the case after the execution of a purported settlement agreement
between the parties, *then* attempted to enforce the settlement agreement when a dispute arose
over its terms despite not reserving jurisdiction to enforce the agreement.  *Id.* at 366-67.  In
contrast, the purported settlement agreement in this case arose while both parties were actively
litigating a present dispute before this court.  Thus, the court has the authority and jurisdiction to
adjudicate defendants' Motion to Enforce Settlement.

[6] Whether parties in a diversity action are entitled to a jury trial is a question determined by
federal law.  *Adams*, 876 F.2d at 709.  However, even if Oregon law is applied, the result is the
same.  *See, e.g.*, *Kaiser Found. Health Plan of the Nw. v. Doe*, 136 Or. App. 566, 573-74 (1995)

based on just the pleadings, *see, e.g.*, *Doi v. Halekulani Corp.*, 276 F.3d 1131 (9th Cir. 2002), the court must conduct an evidentiary hearing, as it did in this case, when "material facts concerning the existence or terms of an agreement to settle are in dispute." *Callie*, 829 F.2d at 890.

## II.    Contract Formation

A "motion to enforce [a] settlement agreement essentially is an action to specifically enforce a contract." *Adams*, 876 F.2d at 709.  Thus, to determine whether there is a settlement agreement, the court first turns to basic principles of contract formation.

### A.    Applicable Law

When a federal court adjudicates a diversity action, it applies state law to resolve substantive issues. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Thus, this court applies Oregon contract law in deciding whether a settlement agreement exists.

Oregon courts subscribe to the objective theory of contracts, which provides that "the existence and terms of a contract are determined by evidence of the parties' communications and acts." *Rhoades v. Beck*, 260 Or. App. 569, 572 (2014).  When evaluating a purported settlement agreement, determining whether "a communication is an offer of settlement depends on whether it objectively manifests the offeror's intent to be bound." *Washington Cty. v. Querbach*, 275 Or. App. 897, 914 (2015).  "The law of contracts is not concerned with the parties' undisclosed intents and ideas." *Kitzke v. Turnidge*, 209 Or. 563, 573 (1957).

"[A]n offer containing a promise for consideration to do an act which a person has a lawful right to do . . . followed by an unqualified and unequivocal acceptance by the person to whom it is made of the offer as made, creates a contract between the person making the offer and

_____

(resolving a request to enforce an oral settlement through the court; no right to a jury trial was mentioned in the decision).

the person accepting it." *C. R. Shaw Wholesale Co. v. Hackbarth*, 102 Or. 80, 94 (1921). "The

acceptance must be positive, unconditional, unequivocal, and unambiguous, and must not

change, add to, or qualify the terms of the offer." *Id.* Additionally, acceptance must be timely,

as "the offer is terminated by the expiration of time limited for acceptance." *Nw. Agencies v.*

*Flynn*, 138 Or. 101, 108 (1931) (citing *Waterman v. Banks*, 144 U. S. 394 (1892)).

### B.    Analysis

As noted, a determination of whether a contract exists begins with whether an offer was

made. In this case, the initial offer was made by Bolen, representing defendants, to Griffin,

representing plaintiff, on August 14, 2018. Def. Ex. 101-1, ECF 47. That offer, expressed via

letter, was "$10,000, payable within 15 days of execution of a settlement agreement and release

of [d]efendants." Def. Ex. 101-2, ECF 47. Bolen's words constitute a clear offer to settle the

case.

Having determined the existence of an offer, the court's analysis shifts to whether the

offer was accepted in a timely fashion. In his letter, Bolen expressly stated defendants' offer was

open and valid for only seven days; therefore, it would have expired on August 21, 2018. *Id.*

However, at the evidentiary hearing, Griffin testified that he informed Bolen that he needed time

to investigate defendants' finances, and that defendants agreed to keep the offer open to allow for

such an investigation. Plaintiff does not contest Griffin's testimony in this regard. Thus,

defendants' offer remained open for acceptance while Griffin worked to confirm the state of

defendants' finances.

Ultimately, Griffin's investigation confirmed defendants' poor financial state, and

following Barakat's directions, Griffin accepted defendants' offer. Def. Ex. 102-1, ECF 47. On

January 9, 2019, Griffin wrote to defendants' counsel that he "just received communication from

Captain Barakat that he will accept Mr. Ward's offer of $10,000 for settlement. Please confirm we have a settlement." Def. Ex. 103, ECF 47. When "a contract is to be founded on offer and acceptance[,] it must be shown that the latter coincides precisely with the former." *Dodge v. Root*, 82 Or. 21, 21 (1917). Here, Griffin's words mirror defendants' offer to provide plaintiff with $10,000 in exchange for a complete settlement of the case.[7]

Finally, a contract formed via offer and acceptance must contain consideration. Here, consideration is rather obvious: plaintiff agreed to cease litigation, and in exchange, defendant agreed to provide $10,000 to plaintiff within fifteen days. The underlying rationale of the settlement is also clear; without it, the parties would have continued to engage in costly and time-consuming litigation that would have likely concluded in an unenforceable judgment against defendants because of their poor financial state.

In sum, the parties agreed to settle this case on January 9, 2019; all further communications, including the later exchange of purported counteroffers, are immaterial given the contract that was already formed between the parties. Thus, unless there is a valid defense to contract formation or enforcement, as discussed below, the words and actions of the parties, through counsel clearly demonstrate the existence of a settlement of this case.

## III.    Defenses to Contract Formation and Enforcement

Plaintiff's testimony and pleadings raise three possible defenses: the absence of a meeting of the minds on material terms of the contract, a lack of authority for Griffin to enter into an

---

[7] Though neither party has raised this issue, the fact that Griffin asked defendants' counsel to "confirm we have a settlement" does not constitute a counteroffer; it merely asks defendants' counsel to confirm receipt of the acceptance without adding additional terms. Def. Ex. 103, ECF 47. Even if a reviewing court construed the phrase, "please confirm we have a settlement," as a material term that constitutes a counteroffer, Button responded affirmatively by confirming there was a settlement, thus forming the contract regardless.

agreement on plaintiff's behalf, and potential duress from Griffin that forced plaintiff to accept defendants' offer.

### A.    Meeting of the Minds

First, plaintiff argues that there was never a meeting of the minds on all essential terms of the contract, thus making an agreement unenforceable. This argument consists of two points: (1) Barakat intended to settle for $260,000, and the $10,000 settlement only served as an initial payment for the matter, and (2) regardless of any agreement, the parties failed to agree on all materials terms of the contract. *See generally* Opp., ECF 31.

### 1.    Initial Payment Theory

Plaintiff claims that the "ultimate terms of the agreement" included "additional payments from defendants totaling $250,000." Opp. 2. ECF 31. The only piece of evidence that could possibly support this theory, beyond Barakat's declaration and testimony, is found within his instructions to Griffin to accept defendants' offer. Specifically, Barakat said:

> I will go for the settlement, but please you most *PHYSICALLY EXCHANGE THE SETTLEMENT DOCUMENTS FOR A $10,000 CASH*, OR A CERTIFIED CASHIERS CHECK. ALSO YOU NEED TO DETERMINE WHICH IT WILL BE BEFOREHAND, AND IF IT IS A CASHIERS CHECK, WE NEED DO THE EXCHANGE IN THAT CASHIER'S CHECK "BANK OFFICE", SO YOU CAN "CASH THE CHECK" RIGHT THERE AND THEN WITH YOUR POWER OF ATTORNEY ... Otherwise, Ward will just DEFAULT ON THIS SETTLEMENT TOO .... and WE will never get paid.

Def. Ex. 102-1, ECF 47 (italicized emphasis added, all-capitals in original, underlined emphasis removed). Arguably, Barakat's directions to "physically exchange the settlement documents for a $10,000 cash" could be interpreted to suggest that the agreement was simply $10,000 in exchange for the settlement *documents*, not the settlement itself. *Id.*

However, the overwhelming weight of the evidence indicates that Barakat knew, at the time of his acceptance, that defendants' offer was to settle the entire case for $10,000. First, on

January 3, 2019, Barakat informed Griffin, "I don't want the $10,000," and instead wanted a judgment against him.  Pl. Ex. 2-1, ECF 53.  This message indicates Barakat knew that defendants' offer was to settle for $10,000, and at that moment, $10,000 was unacceptable—a position that changed, seven days later, when he directed Griffin to "go for the settlement" on January 9, 2019.   Def. Ex. 102-1, ECF 47.

Second, Barakat's directions on January 9, 2019, also indicate he knew that the deal was for only $10,000.  Barakat specifically insisted that Griffin immediately cash the $10,000 payment because he feared that defendants would "just DEFAULT *ON THIS SETTLEMENT* TOO …. And WE will never get paid."  Def. Ex. 102-1, ECF 47 (italics added, all-capitals emphasis in original).  If Barakat truly believed he had only agreed to a $10,000 initial payment, then there would be no reason to refer to it as "this settlement" or express fear that he would "never get paid"—as he would still be able to collect $250,000 from defendants regardless of whether the $10,000 payment went through or not.

Third, Barakat's comment to Griffin that "my heart is bleeding, I've a broken heart, I feel I'm not a man" further indicates that plaintiff agreed to settle for $10,000.  Def. Ex. 104-1, ECF 47.  Plaintiff testified that his remark reflected his response to Griffin's threats to withdraw as counsel.  However, it is not believable that Barakat would feel "broken" by what he claims were the terms of the settlement, as it would have effectively guaranteed him $260,000 despite defendants' serious financial problems.  *Id.*  Instead, defendants' theory is far more plausible, that Barakat felt "broken" because he settled a dispute that originally sought $750,000 in relief, but had to agree to $10,000 due to defendants' dire financial condition.  *Id.*; *see also* Compl. ¶ 30(a)-(f), ECF 1.

Fourth, Barakat's messages to Griffin post-agreement illustrate an (incorrect) belief that the $10,000 settlement had not been finalized. On January 24, 2019, Barakat stated, "the case is no[t] settled until I approve the agreement and signed." Def. Ex. 111, ECF 47. After Griffin informed him that "[t]he case settled when your verbal acceptance was given to defendants," Barakat replied, "you need to give me sometime to get back home, review with somebody the agreement, make up my mind and advise you, *I don't care about the $10,000 in the first place*." Def. Ex. 113, ECF 47 (emphasis added). He added, "I called my friends in USA they all confirming the case is not settle yet. . . . Why when [defendants previously settled and] breached the settlement that was ok and now when I say stop before we signed any papers is not ok." *Id.*

Barakat's remark that he didn't "care about the $10,000 in the first place" indicates he knew the settlement was for $10,000, not $260,000. *Id.* Further, his comments that "the case is no[t] settled until I approve the agreement and signed," Def. Ex. 111, ECF 47, and calling "friends in the USA" who said "the case is not settle yet" and needing time to "review [] the agreement" and "make up my mind," Def. Ex. 113, ECF 47, illustrate a (mistaken) belief that he still possessed the opportunity to back out of the deal for $10,000 because he had not signed any documents. *Id.* And the question he asked Griffin—why defendants could breach their prior agreement in *Lojy I*, yet he could not "stop before we signed any papers"—indicates a desire to void what he believed was an underwhelming settlement. *Id.*

Fifth, there is no reason to doubt the testimony of Griffin, who has no financial stake in the outcome of this case, but there is reason to doubt the testimony of Barakat, who does. Griffin terminated his representation—ending a roughly 10-year relationship with plaintiff—because, in part, "the client persist[ed] in maintaining a course of action . . . which the lawyer reasonably believes *is fraudulent*." Mot. Withdraw 2, ECF 22 (emphasis added). At the evidentiary

hearing, Griffin testified that the authority he received from Barakat to settle the case was not conditioned on plaintiff receiving an additional $250,000.  In short, Griffin felt compelled to terminate his relationship with plaintiff, and refrained from zealously advocating that the actual deal was for $260,000, because such a position would be inconsistent with the directions he had received from plaintiff.

Barakat, on the other hand, declared to this court, under penalty of perjury, that he "never told Mr. Griffin [he] would settle [this] case for only $10,000."  Barakat Decl. ¶ 6, ECF 31-1. But, as discussed above, exhibits submitted by both parties illustrate he knew the settlement was worth $10,000 and ordered Griffin to "go for the settlement."  Pl. Ex. 2-1, ECF 53; Def. Ex. 102-1, ECF 47.  Barakat claims that the "ultimate terms of the agreement" included "additional payments from defendants totaling $250,000."  Opp. At 2, ECF 31.  Yet the evidence demonstrates the first time Barakat mentioned *any* sum above $10,000 was on February 7, 2019—nearly a month after his acceptance—when he notified Griffin that "in order to I settle for [Bolen's] terms and condition I'll settle for *hundred and fifty thousand dollars*."[8]  Def. Ex. 115, ECF 47 (emphasis added).

Finally, "the existence and terms of a contract are determined by evidence of the parties' communications and acts."  *Rhoades*, 260 Or. App. at 572.  Simply put, "[t]he law of contracts is not concerned with the parties' undisclosed intents and ideas."  *Kitzke*, 209 Or. at 573.  Barakat has proffered nothing, beyond his impeachable declaration and testimony, to demonstrate he

---

[8] Notably, on January 2, 2019, Barakat sent Griffin a WeChat message stating that "[I] don't want the $10,000. I want and gudagment [*sic*] against him."  Pl. Ex. 2-1, ECF 53.  However, Barakat did not indicate the figure he actually sought—just that he wanted a judgment against defendants.  Moreover, a week after sending this message, Barakat instructed Griffin to "go for the settlement", suggesting that he had reversed course and agreed to defendants' offer.  Def. Ex. 102-1, ECF 47.

communicated an intent to only settle for $260,000.[9]  Even if Barakat had intended to only settle

the case for $260,000, as he claims, or $150,000, as he stated in February 2019, the

overwhelming evidence in the record demonstrates that Barakat directed Griffin to settle this

dispute with prejudice for $10,000 on January 9, 2021.  Def. Ex. 102-1, ECF 47.  Plaintiff's

previously-unstated intent to settle for a higher amount is thus not only immaterial, but also

inconsistent with the record before the court.

### 2.    Absence of Material Terms

Plaintiff also alleges there was never a meeting of the minds as to all material terms of

the contract.  Opp. 3-6, ECF 31.  Plaintiff cites extensively to *Callie v. Near*, a case where the

Ninth Circuit vacated the enforcement of a settlement agreement because the district court failed

to conduct an evidentiary hearing and the parties' purported offer and acceptance failed to "agree

upon the theory of liability upon which the judgment would be based."  828 F.2d at 891.  The

Ninth Circuit emphasized the importance of that missing term:

> Any mention of fraud in the judgment would jeopardize the appellants' business
> (syndicated real estate limited partnerships) because it is subject to rigid securities
> regulations. Counsel for the appellants indicated that a securities counsel for the
> appellants who was involved in the settlement negotiations could be called to
> clarify this issue. Because the appellants presented allegations which, if true,
> would indicate that there was no meeting of minds sufficient to effect a settlement
> agreement, the district court could not properly resolve this factual dispute merely
> by weighing the affidavits and relying on the unsworn statements of counsel.

*Id.*

---

[9] Plaintiff submitted, as evidence, emails between Barakat and Griffin in 2016 where Barakat communicated his intent to accept "$150,000 with a timetable" to settle the prior case, *Lojy I.* Pl. Ex. 1-1, ECF 53.  However, this evidence is afforded little weight, as it reflects discussions from three years ago in a different dispute between the parties.  Moreover, the evidence only indicates an intent to settle for $150,000, not the $260,000 that plaintiff now claims was the ultimate amount sought.  *See* Opp. 2, ECF 31.

This case differs from *Callie* in two important respects.  First, the court has conducted an evidentiary hearing that has included examination and cross-examination of all the witnesses the parties have proffered.  Second, and more importantly, plaintiff has failed to identify what "essential terms," if any, were missing from defendants' offer or plaintiff's acceptance.  While plaintiff alleges the deal was "incomplete," *see* Opp. 3, ECF 31, the material terms of the offer and acceptance are clear: "$10,000, payable within 15 days of execution of a settlement agreement and release of [d]efendants."  Def. Ex. 101-2, ECF 47.[10]  Plaintiff's failure to advise the court what material terms are missing in both its pleadings and at the evidentiary hearing makes *Callie* inapplicable to the present case.

### B.    Lack of Authority to Enter Contract

At the evidentiary hearing, Barakat testified that he did not provide Griffin with any authorization to unilaterally settle the case on his behalf, and stressed all decisions related to settlement were to be made by him alone.  This testimony raises a question of actual authority, i.e., whether Griffin had the authority to enter a legally binding contract on his client's behalf.

---

[10] Though neither party has raised this issue, the fact that defendants' offer included "execution of a settlement agreement" does not mean that the *formation* of a contract is voided.  Def. Ex. 101-2, ECF 47.  The events that occurred here are similar to those in *Bridge City Fam. Med. Clinic, P.C. v. Kent & Johnson, LLP*, 270 Or. App. 115 (2015).  In that case, the court wrote:

> Parties can agree that a contract will not be binding unless and until it is reduced to writing. That is not what happened here. By the terms of Schafer's correspondence, the *release* was not to become effective until signed.  The *contract* between the parties was achieved when they reached an accord on the dollar amount and *the fact that a release would be executed.* Thus, the signing of the release was a condition precedent to the performance of the contract, not to the formation of the contract.

*Id.* at 124 (emphasis in original).  Here, defendants' offer is "$10,000 payable within 15 days of execution of a settlement agreement and release."  Def. Ex. 101-2, ECF 47.  Plaintiff's acceptance of that offer confirmed the agreement on dollar amount and the fact that a release would be executed.

Under Oregon law, "an attorney does not have authority arising merely from his employment" to enter a settlement on behalf of his client. *Johnson v. Tesky*, 57 Or. App. 133, 136 (1982). Additionally, an attorney who has "authority to negotiate with the opposing party does not, by itself, imply the power to reach a binding agreement; the client's express authorization is necessary." *Id.* at 136-37. Thus, Griffin did not possess authority to settle on plaintiff's behalf by virtue of being its attorney; some form of authority was needed.

However, here, Barakat did explicitly instruct Griffin to accept defendants' offer and settle the case for $10,000. Def. Ex. 102-1, ECF 47. Specifically, when Barakat wrote that he would "go for the settlement," he conveyed his willingness to accept defendants' offer, and directed Griffin to accomplish such a result.[11] *Id.* Thus, there is no question that Griffin had the actual authority to enter into a contract on behalf of plaintiff, as he had "the client's express authorization" to do so. *Tesky*, 57 Or. at 136-37.

### C.    Duress

Plaintiff does not argue that Barakat's directions instructing Griffin to accept defendants' offer were made under duress, and the evidence in the record does not support such a theory. Plaintiff did, however, produce a WeChat message that Griffin sent to Barakat on January 2, 2019, in which Griffin said he would file a withdrawal of counsel later that week. *See* Pl. Ex. 2-1, ECF 53. At the evidentiary hearing, Barakat testified that he wrote "my heart is bleeding, I've a broken heart, I feel I'm not a man" in response to Griffin's email confirmation of the settlement, *see* Def. Ex. 104-1, ECF 47, because Griffin "was threatening me that he was going to leave the case . . . and put me under pressure," and "[t]hat's why I told him I was feeling that

---

[11] This evidence directly rebuts Barakat's declaration that he "never told [Griffin that he] would settle [his] case for only $10,000, and [he] would have never agreed to such a preposterous deal." Barakat Decl. ¶ 6, ECF 31-1.

my heart was broken because I responded to his pressure."  Barakat's comments raise at least a

colorable argument that his directions were given under duress.

Oregon courts generally hold that "such pressure or constraint as compels a man to go

against his will, and virtually takes away his free agency, and destroys the power of refusing to

comply with the unlawful demand of another, will constitute duress, irrespective of the

manifestation or apprehension of physical force."  *Cram v. Powell*, 100 Or. 708, 719-20 (1921).

Thus, if the court finds that Barakat's acceptance of defendants' offer was made under duress,

the contract is automatically void.

However, there is no evidence of cognizable duress in this record.  At the outset, neither

party has commented on whether pressure from someone who is not a party to the contract can

support a duress defense, especially if the other party had no knowledge of that pressure.  Even if

such a theory was cognizable, Griffin's actions, which consisted of threats to withdraw as

counsel, did not compel Barakat to "go against his will" or "virtually take away his free agency"

or "destroy the power of refusing to comply with [Griffin's] demands."  *Id.*  Barakat could have

responded to Griffin's actions in a variety of different ways, including finding new counsel and

declining to respond to Griffin's messages.  Put differently, Griffin's comments did not force

Barakat to affirmatively instruct him to "go for the settlement"; he did so, on his own volition,

seven days after the alleged threat was made.  Def. Ex. 102-1, ECF 47.  These facts simply do

not constitute duress that would render an agreement void.

In sum, the parties agreed to settle the case according to the terms set out in defendants'

offer: "$10,000, payable within 15 days of execution of a settlement agreement and release of

[d]efendants."  Def. Ex. 101-1, ECF 47.  The settlement agreement provided by defendants, *see*

Mot. 4, ECF 22, is consistent with the terms of that offer and does not add any additional material terms.  Therefore, the settlement agreement is enforceable.

## RECOMMENDATIONS

Defendants' Motion to Enforce Settlement (ECF 26) should be GRANTED.

## SCHEDULING ORDER

These Recommended Findings of Fact and Conclusions of Law will be referred to a district judge.  Objections, if any, are due Monday, January 24, 2022.  If no objections are filed, then the Recommended Findings of Fact and Conclusions of Law will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Recommended Findings of Fact and Conclusions of Law will go under advisement.

## NOTICE

These Recommended Findings of Fact and Conclusions of Law are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED  January 10, 2022.


/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge